UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTHA M. BOHNAK and DEBBIE JO TERZOLI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TRUSTED MEDIA BRANDS, INC.<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Martha M. Bohnak and Debbie Jo Terzoli ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Trusted Media Brands, Inc. ("TMBI" or "Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

**NATURE OF ACTION**

1. Defendant TMBI rented, exchanged, and/or otherwise disclosed detailed information about Plaintiff Bohnak's *Taste of Home* and Plaintiff Terzoli's *Reader's Digest* magazine subscriptions to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed their information to aggressive advertisers, political organizations, and non-profit companies. As a result, Plaintiffs have received a barrage of unwanted junk mail.

2. Defendant's use of Plaintiffs' identities on the mailing lists that it rents, exchanges, and/or otherwise discloses (including in connection with the *Taste of Home* and *Reader's Digest* magazine subscriptions previously sold to Plaintiffs) directly violated Ohio's and California's misappropriation of name or likeness statutes. Ohio Revised Code Sec. 2741.01, *et.*

*seq*; California Civil Code Sec. 3344.

3.      Documented evidence confirms these facts.  For example, a list broker, Lake Group Media, Inc. ("Lake Group"), offers to provide renters access to the mailing list titled "TASTE OF HOME MASTERFILE & ENHANCED", which contains the names and identities of 1,060,010 of TMBI's active U.S. subscribers at a base price of "$115.00/M [per thousand]," (*i.e.*, 11.5 cents apiece), as shown in the screenshot below:

**Taste of Home**
**TASTE OF HOME MASTERFILE & ENHANCED**

| | | |
|---|---|---|
| 1,060,010 | Active U.S. Subs/Buyers | $115.00/M |
| 919,338 | Active U.S. Subscribers | $115.00/M |
| 270,541 | Active U.S. Book Buyers | $115.00/M |
| 33,040 | Jun'21 Subs/Buyers | +$ 17.00/M |
| 157,026 | Apr'21-Jun'21 Subs/Buyers | +$ 14.00/M |
| 355,678 | Jan'21-Jun'21 Subs/Buyers | +$ 9.00/M |
| 21,847 | Jun'21 DTP Subs/Buyers | +$ 29.00/M |
| 11,647 | Apr'21-Jun'21 COA's | +$ 30.00/M |
| 41,646 | Active Shop TOH Buyers | $115.00/M |
| | 3 Month Expires | $ 80.00/M |
| | Fundraiser/Non-Profit | $ 80.00/M |
| | Catalog Rate | $ 80.00/M |

Taste of Home, published by Trusted Media Brands (formerly Reader's Digest), is a go-to resource for information on food, cooking and entertaining. Readers from across the United States and Canada subscribe to the magazine and/or purchase cookbooks branded under Betty Crocker, Pillsbury, Country, Country Woman, Simple & Delicious and Taste of Home. Each year thousands of home cooks submit more than 40,000 recipes, of which 3,000 are published by Taste of Home, making Taste of Home one of the largest and most successful practitioners of user generated content. Taste of Home subscribers and book buyers have been combined to bring the largest single source of Taste of Home consumers to market.

(Formerly a Reader's Digest / Reiman publication)

\*\*\*\*\*\*\*\*\*\*\*\*\*\* Fast Facts
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Median Age..... ...........................59
Median Income...........................$64,568
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*Enhancements available.  See Trusted Media Brands - Magazines MF & Enhanced.\*\*

USAGE:
Allrecipes.com Magazine
Better Homes & Gardens
Cook's Country
Cook's Illustrated
Food Network Magazine
Good Housekeeping Magazine
Meals on Wheels Co-Op
Midwest Living
Minneapolis/St. Paul Magazine
National Mail Marketing
Our IOWA Magazine
Pioneer Woman

RELATED LGM LISTS:
BON APPETIT MAGAZINE & ENHANCED
FOOD NETWORK MAGAZINE
MILK STREET MAGAZINE
MINNEAPOLIS ST PAUL MAGAZINE - ACTIVE SUBSCRIBERS
SIMPLE & DELICIOUS MAGAZINE & ENHANCED
TRUSTED MEDIA BRANDS - COOKING MASTERFILE

LAST UPDATE:
July 29, 2021

GENDER:
16% Male/84% Female

MINIMUM ORDER:
7,500

SOURCE:
Direct Mail Sold

MEDIA:
E-Mail              @ $75.00/F
FTP                 @ $75.00/F

UNIT OF SALE:
$20.00 Average

UPDATE FREQUENCY:
Monthly

SELECTION:
Monthly H/L         @ $17.00/M
3 Mos H/L           @ $14.00/M
6 Mos H/L           @ $ 9.00/M
COA's               @ $16.00/M
Donors              @ $16.00/M
Gift Givers         @ $16.00/M
New To File         @ $12.00/M
Renewals            @ $12.00/M
Source              @ $12.00/M
Paid                @ $12.00/M
Lifestyle           @ $16.00/M
Age                 @ $16.00/M
Child Age           @ $16.00/M
Income              @ $16.00/M
Ethnicity           @ $16.00/M
Religion            @ $16.00/M
Gender              @ $ 9.00/M
3rd Party Blow In   @ $10.00/M
Non Reciprocal      @ $10.00/M
SCF                 @ $ 9.00/M
State               @ $ 9.00/M
Zip                 @ $ 9.00/M
Key Coding          @ $ 3.00/M

NET NAME POLICY:
85% and $10.00/M RunCharge
50,000 Minimum

NextMark ID: 355113

*See* **Exhibit A** hereto.

4. Lake Group also offers to provide renters access to the mailing list titled "READER'S DIGEST MAGAZINE & ENHANCED", which contains the names and identities of 1,588,659 of TMBI's active U.S. subscribers at a base price of "$115.00/M [per thousand]," (i.e., 11.5 cents apiece), as shown in the screenshot below:

**Reader's digest**

**READER'S DIGEST MAGAZINE & ENHANCED**

| | | |
|---|---|---|
| 1,588,659 | Active U.S. Subscribers | $115.00/M |
| 84,111 | Jun'21 Subscribers | +$ 17.00/M |
| 286,857 | Apr'21-Jun'21 Subs | +$ 14.00/M |
| 612,754 | Jan'21'Jun'21 Subs | +$ 9.00/M |
| 10,090 | Jun'21 Change of Address | +$ 33.00/M |
| | Expires | $ 80.00/M |
| | Fundraiser/Non-Profit | $ 80.00/M |
| | Catalog Rate | $ 80.00/M |

Reader's Digest, published by Trusted Media Brands, is America's favorite magazine because it entertains and inspires their readers. The content is carefully and expertly selected to provide ideas and tools to simplify and enrich their reader's lives in various topics including Health, Cooking, Parenting, Finance and Travel. The Reader's Digest subscriber is Life Smart and they are curious to learn about all facets of life.

```
*****************Fast Facts*****************
Median Age............................53.5
Median HHI........................$58,222
Attended/Graduated College.............30%
Employed...............................54%
Married................................62%
Kids in Household......................34%
Own a Home.............................77%
*********************************************
```

**Enhancements available. See Trusted Media Brands Masterfile and Enhanced.**

USAGE:
AARP
American Red Cross
Childrens Hosp. Cancer Consortium
Consumer Reports
Daily Word
Good Housekeeping Magazine
Howard Jarvis Taxpayers Assoc.
Meals on Wheels Co-Op
Meals on Wheels/San Antonio
Missouri Life
National Mail Marketing
Nutrition Action Healthletter
Our State Down Home In NC
Popular Mechanics Magazine
Regional Food Bank Of NE NY
Rescue Missions
Salvation Army/Southern Californi
St. Jude Children's Hospital
Texas Monthly
Tufts University

RELATED LGM LISTS:
BONNIER CORPORATION ENHANCED MASTERFILE
CONDE NAST SENIORS MASTERFILE
GOOD HOUSEKEEPING
LIFTBASE CONSUMER MASTERFILE

LAST UPDATE:
July 29, 2021

GENDER:
36% Male/54% Female

MINIMUM ORDER:
7,500

SOURCE:
Direct Mail Sold

MEDIA:
E-Mail    @ $75.00/F
FTP       @ $75.00/F

UNIT OF SALE:
$10.00 Average

UPDATE FREQUENCY:
Monthly

SELECTION:
Monthly H/L      @ $17.00/M
3 Mos H/L        @ $14.00/M
6 Mos H/L        @ $ 9.00/M
COA's            @ $16.00/M
Donors           @ $16.00/M
Gift Givers      @ $16.00/M
New To File      @ $12.00/M
Renewals         @ $12.00/M
Homeowner        @ $ 7.00/M
Source           @ $12.00/M
Paid             @ $12.00/M
Lifestyle        @ $16.00/M
Age              @ $16.00/M
Child Age        @ $16.00/M
Income           @ $16.00/M
Ethnicity        @ $16.00/M
Religion         @ $16.00/M
Non Reciprocal   @ $10.00/M
Gender           @ $ 9.00/M
State            @ $ 9.00/M
SCF              @ $ 9.00/M
Zip              @ $ 9.00/M
Zip Set-Up       @ $50.00/F
3rd Party Blow-in @ $10.00/M
Key Coding       @ $ 3.00/M

NET NAME POLICY:
85% and $10.00/M RunCharge
50,000 Minimum

NextMark ID: 355101

See **Exhibit B** hereto.

5. Lake Group also offers to provide renters access to the mailing list titled "TRUSTED MEDIA BRANDS - MAGAZINES MF & ENHANCED", which contains the

names and identities of all 4,095,612 of TMBI's active U.S. subscribers for all TMBI magazines at a base price of "$115.00/M [per thousand]," (i.e., 11.5 cents apiece), as shown in the screenshot below:



**TRUSTED MEDIA BRANDS - MAGAZINES MF & ENHANCED**

| | | |
|---|---|---|
| 4,095,612 Active U.S. Subscribers | $115.00/M | **LAST UPDATE:** July 29, 2021 |
| 229,127 Jun'21 Subscribers | +$ 17.00/M | |
| 819,945 Apr'21-Jun'21 Subs | +$ 14.00/M | **GENDER:** |
| 1,700,174 Jan'21-Jun'21 Subs | +$ 9.00/M | 20% Male/72% Female |
| 3,154,928 Jul'20-Jun'21 Subs | $115.00/M | |
| 12 Month Paid Gift Givers | +$ 16.00/M | **MINIMUM ORDER:** 7,500 |
| Active Canadian Subs | $125.00/M | |
| Fundraiser/Non-Profit | $ 80.00/M | **SOURCE:** Direct Mail Sold |
| Catalog Rate | $ 80.00/M | |

Trusted Media Brands (formerly Reader's Digest / Reiman Publications) is a leading publisher that offers mature consumers the opportunity to subscribe to one of their well known magazine titles. This masterfile was created using Birds & Blooms, Country, Country Woman, Family Handyman, Farm & Ranch Living, Reader's Digest, Reader's Digest Large Print, Reminisce, Simple & Delicious, and Taste of Home subscribers in order to give mailers the opportunity to best utilize the database. The file has been enhanced with data to offer a robust product for increased selectability and usage.

Mailers have the opportunity to create "sub-group" masterfiles through specific publication selects.

**MEDIA:**
E-Mail   @ $75.00/F
FTP      @ $75.00/F

**UNIT OF SALE:** $20.00 Average

**UPDATE FREQUENCY:** Monthly

****************Fast Facts****************
Average Age..........................63
Average HHI.....................$56,400
*****************************************

**SELECTION:**
Monthly H/L       @ $17.00/M
3 Mos H/L         @ $14.00/M
6 Mos H/L         @ $ 9.00/M
COA's             @ $16.00/M
Donors            @ $16.00/M
Gift Givers       @ $16.00/M

Can Select by Customer Age @ $16.00/M Extra:
(Please inquire for counts.)

New To File       @ $12.00/M
Renewals          @ $12.00/M
Source            @ $12.00/M
Paid              @ $12.00/M
Title             @ $12.00/M

Can Select by Income @ $16.00/M Extra:
(Please inquire for counts.)

Lifestyle              @ $16.00/M
Grandchildren          @ $16.00/M
Political Affiliation  @ $16.00/M
Age                    @ $16.00/M
Homeowner              @ $ 7.00/M
Child Age              @ $16.00/M
Child Presence         @ $16.00/M
Income                 @ $16.00/M

Can select Children's Age @ $16.00/M Extra:
(Please inquire for counts.)
Gender Selectable:
Age 0-2
Age 3-5
Age 6-10
Age 11-15
Age 16-17

Can select by Ethnicity @ $16.00/M Extra:
(Please inquire for additional selections and counts.)
African American
German
Hispanic
Irish

Ethnicity          @ $16.00/M
Religion           @ $16.00/M
Gender             @ $ 9.00/M
3rd Party Blow In  @ $10.00/M
Non Reciprocal     @ $10.00/M
State              @ $ 9.00/M
SCF                @ $ 9.00/M
Zip                @ $ 9.00/M
Key Coding         @ $ 3.00/M

Can select by Religion @ $16.00/M Extra:
(Please inquire for additional selections and counts.)
Catholic
Jewish
Protestant

**NET NAME POLICY:**
85% and $10.00/M RunCharge
50,000 Minimum

Can Select by Lifestyle Interest @ $16.00/M Extra:
(Please inquire for additional selections and counts.)
CATALOG BUYERS
COLLECTING:
Collectibles & Antiques
Dolls
Figurines
Sports Memorabilia
Stamps/Coins
DONORS/CONTRIBUTORS:
(See Trusted Media Brands - Charitable Donors)
HOBBIES & INTEREST:
Auto Work

NextMark ID: 355097

*See* **Exhibit C** hereto.

6. To supplement its revenues, TMBI rents, exchanges, or otherwise discloses its customers' information—including their full names, titles of publications subscribed to, and home addresses, as well as myriad other categories of individualized data and demographic information such as gender, ethnicity, and religion—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers.

7. By renting, exchanging, or otherwise disclosing – rather than selling – its customers' names and identities, TMBI is able to disclose the information time and time again to countless third parties.

8. TMBI's disclosure of names and identities and other individualized information is not only unlawful but is also dangerous, because it allows malignant actors to target particular members of society. For example, anyone could buy a customer list provided by TMBI that contains the names and addresses of all women over the age of 50, who are African American, have children under the age of 10, live in Cuyahoga Falls, Ohio, and subscribe to *Taste of Home*. Such a list is available for sale on the open market for approximately $208.00 per thousand subscribers listed.

9. While TMBI profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' names and identities and other individualized information, it does so at the expense of its customers' statutory privacy rights because TMBI does not obtain its customers' written consent prior to disclosing their names and identities.

### DEFENDANT MISAPPROPRIATES PLAINTIFFS' IDENTITIES

10. Ohio's misappropriation of name or likeness statute states that: "a person shall not use any aspect of an individual's persona for a commercial purpose." OH ST § 2741.02.

11. One of the ways that the Ohio statute defines commercial purpose is "the use of or reference to an aspect of an individual's persona … [o]n or in connection with a place, product, merchandise, goods, services, or other commercial activities." OH ST § 2741.01(B).

12.     Similarly, California's misappropriation of name or likeness statute, California Civil Code Sec. 3344, bans the knowing use of "another's name, … or likeness, in any manner, on or in products, merchandise, or goods … without such person's prior consent."

13.     Selling the name and subscriber information as detailed above clearly constitutes using a person's name on and/or in connection with a product, service, and/or other commercial activity.

14.     When the California legislature amended California Civil Code Sec. 3344 in 1984, they inserted the phrase, "on or in products, merchandise, or goods." Stats.1984, ch. 1704, § 2, p. 6172.  By adding this language (which also appears in Ohio Revised Code Sec. 2741.01(B)), the California legislature meant to make liable any entity who uses another person's name in their product rather than simply in a product's advertising. *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 801-02 (Cal. 2001).

15.     Additionally, neither Plaintiffs nor class members provided Defendant with written consent to use their identities in Defendant's products or other commercial activities.  As detailed above, TMBI uses class members' names and identities in its products, services, and/or other commercial activities.  Thus, Defendant violates both Ohio Revised Code Sec. 2741.01, *et. seq.* and California Civil Code Sec. 3344.

16.     Plaintiffs are not challenging Defendant's core business as a magazine publisher. Defendant could easily maintain its business model while still complying with California and Ohio state law.

17.     TMBI knowingly obtains private and/or identifying information from Ohio and California residents.  Indeed, this lawsuit concerns Defendant's business practice of acquiring identifying information about Ohio and California residents with the specific intent of selling that information to its customers.

18.     Additionally, TMBI directly sells its services to consumers in Ohio and California.

**PARTIES**

19. Plaintiff Martha M. Bohnak is a citizen of Ohio who resides in Cuyahoga Falls, Ohio.

20. Plaintiff Debbie Jo Terzoli is a citizen of California who resides in Rancho Cordova, California.

21. Defendant Trusted Media Brands, Inc. is a Delaware corporation with its principal place of business located in White Plains, New York.

**JURISDICTION AND VENUE**

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and Plaintiffs, together with most members of the proposed class, are citizens of states different from TMBI.

23. This court has specific personal jurisdiction over Defendant because TMBI maintains its principal place of business in this district.

24. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant is at home in this district.

**FACTS COMMON TO ALL CAUSES OF ACTION**
*The Private Information Market:*
*Consumers' Private Information Has Real Value*

25. In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

---

[1] The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at*

26. More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

27. The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[3]

28. In fact, an entire industry exists in which companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

29. The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation

---

https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 30, 2021).

[2] *See* Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited July 30, 2021).

[3] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021) (emphasis added).

[4] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

8

dreams—and on and on."[5]

30. Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[6]

31. Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[7]

32. In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[8]

33. Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers

---

[5] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N120616S.pdf (last visited July 30, 2021).

[6] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

[7] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[8] *Id.*

often use information about consumers to lure them into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like TMBI share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

34. Information disclosures like those made by TMBI are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]  Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

35. Thus, information disclosures like TMBI's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

---

[9] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[10] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[11] *Id.*

[12] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 30, 2021).

[13] *See id.*

36. TMBI is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

37. Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### *Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases*

38. As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

39. A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers avoid doing business with companies who they believe do not protect their privacy online.[14] The same is true for 81 percent of smartphone users, who say that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

40. Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

41. In fact, consumers' private information has become such a valuable commodity

---

[14] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[15] *Id.*

that companies are beginning to offer individuals the opportunity to sell their information themselves.[16]

42. These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[17]

43. Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18]

**TMBI** *Unlawfully Rents, Exchanges, And Discloses Its Customers' Names And Identities*

44. TMBI maintains a vast digital database comprised of its customers' Private Reading Information. TMBI discloses its customers' names and identities to data aggregators and appenders, who then supplement that information with additional sensitive private information about each TMBI customer, including his or her gender. (*See, e.g.*, **Exhibit A**, **Exhibit B**, and **Exhibit C**).

45. TMBI then rents and/or exchanges its mailing lists—which include subscribers'

---

[16] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[17] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[18] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

names and identities and identifying which individuals purchased subscriptions to particular magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**, **Exhibit B**, and **Exhibit C**).

46. TMBI also discloses its customers' names and identities to data cooperatives, which in turn give TMBI access to their own mailing list databases.

47. As a result of TMBI's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from TMBI that identify TMBI's customers by intimate details such as their gender, ethnicity, and religion. TMBI's disclosure of sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

48. TMBI does not seek its customers' prior consent, written or otherwise, for any of these disclosures, and its customers remain unaware that their names and identities and other sensitive information are being rented and exchanged on the open market.

49. Consumers can sign up for subscriptions to TMBI's publications through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes, TMBI never requires the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant time period. Consequently, during the relevant time period, TMBI uniformly fails to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their names and identities.

50. As a result, TMBI disclosed its customers' names and identities – including their

reading habits and preferences that can "reveal intimate facts about [their] lives, from our political and religious beliefs to our health concerns"[19] – to anybody willing to pay for it.

## CLASS REPRESENTATION ALLEGATIONS

51. Plaintiffs seek to represent two Classes (collectively the "Classes").

52. Plaintiff Bohnak seeks to represent a class defined as all Ohio residents who, at any point in the relevant statutory period, had their personas rented, exchanged, and/or otherwise disclosed or whose personas were offered for rental, exchange, and/or disclosure on a mailing list rented or offered for rental by TMBI without prior consent (the "Ohio Class").

53. Plaintiff Terzoli seeks to represent a class defined as all California residents who, at any point in the relevant statutory period, had their names rented, exchanged, and/or otherwise disclosed or whose names were offered for rental, exchange, and/or disclosure on a mailing list rented or offered for rental by TMBI without prior consent (the "California Class").

54. Members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Classes number in the hundreds of thousands. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

55. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> a. Whether TMBI uses class members' names and identities on or in its products, services, and/or its other commercial activities for its own commercial benefit;

---

[19] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

      b. Whether the conduct described herein constitutes a violation of Ohio Revised Code Sec. 2741.01, *et seq.*;

      c. Whether the conduct described herein constitutes a violation of California Civil Code section 3344;

      d. Whether Plaintiffs and the classes are entitled to injunctive relief; and

      e. Whether Defendant violated the privacy of members of the class.

56. The claims of the named Plaintiffs are typical of the claims of the Classes.

57. Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

58. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Classes. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Defendant has acted or refused to act on grounds that apply generally to the classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

## COUNT I
**Violation of Ohio Revised Code Sec. 2741.01, *et. seq.***

59. Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

60. Plaintiff Bohnak brings this claim individually and on behalf of the members of the Ohio Class.

61. Ohio Revised Code Sec. 2741.01, *et. seq.*, prohibits using an individual's name for a commercial purpose without written consent.

62. One of the ways that the Ohio statute defines commercial purpose is "the use of or reference to an aspect of an individual's persona … [o]n or in connection with a place, product, merchandise, goods, services, or other commercial activities."  OH ST § 2741.01(B)

63. As shown above, Defendant used Plaintiff Bohnak's and the putative class members' names and likenesses on or in connection with Defendant's products, services, or other commercial activities without the consent of Plaintiffs or class members.

64. The aspects of Plaintiffs' persona that Defendant uses on or in connection with its products, services, or other commercial activities have commercial value.

65. Plaintiff Bohnak is domiciled and suffered injury in Ohio.

66. Defendant had knowledge that Plaintiffs' personas were being used on in connection with its products, services, or other commercial activities without authorization.

67. Based upon Defendant's violation of Ohio Revised Code Sec. 2741.01, *et. seq.*, Plaintiff Bohnak and members of the Ohio Class are entitled to (1) an injunction requiring Defendant to cease using Plaintiff Bohnak's and members of the Ohio Class's names and any attributes of their identities on or in connection with its products, services, or other commercial activities, (2) statutory damages in the amount of between $2,500 and $10,000 per violation to the members of the Ohio Class, (3) an award of punitive damages or exemplary damages, and (4) an award of reasonable attorney's fees, court costs, and reasonable expenses under OH ST § 2741.07.

## COUNT II
### Violation of California Civil Code section 3344.

68. Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

69. Plaintiff Terzoli brings this claim individually and on behalf of the members of the California Class.

70. California's misappropriation of name or likeness statute, California Civil Code Sec. 3344 bans the knowing use of "another's name, … in any manner, on or in products, merchandise, or goods … without such person's prior consent."

71. As shown above, Defendant used Plaintiff Terzoli's and the putative class members' names on or in Defendant's products without the consent of Plaintiffs or class members.

72. The aspects of Plaintiffs names that Defendant uses on or in its products have commercial value.

73. Plaintiff Terzoli is domiciled and suffered injury in California.

74. Defendant had knowledge that Plaintiffs names were being used on or in its products without prior consent.

75. Based upon Defendant's violation of California Civil Code Sec. 3344, Plaintiff Terzoli and members of the California Class are entitled to (1) an injunction requiring Defendant to cease using Plaintiff Terzoli's and members of the California Class's names and any attributes of their identities on or in its products and services, (2) statutory damages of $750 per violation, (3) lost profits from the unauthorized use of Plaintiff Terzoli's and members of the California Class's names in the amount of Defendant's gross revenue attributable to such use, (4) an award of punitive damages or exemplary damages, and (5) an award of reasonable attorney's fees, court costs, and reasonable expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a. For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives of the Classes and Plaintiffs' attorneys as Class Counsel to represent members of the Classes;

b. For an order declaring the Defendant's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

d. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief;

g. For all injunctive relief the court finds appropriate; and

h. For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: September 7, 2021                Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ Philip L. Fraietta*
         Philip L. Fraietta

Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150

Fax: (212) 989-9163  
E-Mail:  pfraietta@bursor.com

*Attorney for Plaintiffs*